```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ESTATE OF JAMES J. MANDARINO,           :
                                               OPINION AND ORDER
                                        :      04 Civ. 148 (GWG)
            Plaintiff,
                                        :
        -v-
                                        :
JAMES MANDARINO et al.,
                                        :
            Defendants.
-----------------------------------------------------------------x
```

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

On September 30 and October 1, 2009, this Court held an evidentiary hearing on the issue of whether the statute of limitations applicable to this action should be equitably tolled. For the reasons discussed below, plaintiff has not shown that equitable tolling is appropriate in this case. Accordingly, the complaint is dismissed on statute of limitations grounds.

I.      BACKGROUND

        A.      Procedural History

On January 8, 2004, plaintiff James J. Mandarino ("James Sr.") filed suit against his son, James Mandarino ("James Jr."), and James Sr.'s former wife, Alexandria Paolercio, alleging that they stole property belonging to him beginning in 1993. See Complaint with Jury Demand, filed Jan. 8, 2004 (Docket # 1) ("Compl.") ¶¶ 19-47. In the complaint, plaintiff made claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO") as well as claims for breach of fiduciary duty, common law fraud, conversion, and consumer fraud under state law. See id. ¶¶ 48-67. Defendants moved to dismiss on a number of grounds, including failure to state a claim and the bar imposed by the relevant statutes of limitations. See Notice of Motion to

Dismiss in Lieu of an Answer Pursuant to Rule 12(b)(6) and to Impose Sanctions Pursuant to Rule 11, filed Mar. 5, 2004 (Docket # 5); Memorandum of Law in Support of the Motion of Defendants, James Mandarino and Alexandra Paolercio to Dismiss in Lieu of an Answer and to Impose Rule 11 Sanctions, filed Mar. 5, 2004 (Docket # 6), at 9-11. On July 14, 2005, the District Court, per Judge Kimba M. Wood, dismissed plaintiff's claims for consumer fraud for failure to state a claim and dismissed one fraud allegation with respect to events in 2003 for failure to plead fraud with particularity. Mandarino v. Mandarino, 2005 WL 1661098, at *3-5 (S.D.N.Y. July 14, 2005) ("Mandarino I"). The remaining claims were dismissed as time-barred under the relevant state and federal limitation periods. See id. at *2-3. Judge Wood further held that plaintiff's claims could not be tolled on the grounds of "mental incapacity" because James Sr. had "participat[ed] in two lawsuits during the time period of his alleged mental incapacity" and therefore could not "avail himself of New York's toll for insanity." Id. at *3.

On May 11, 2006, the Second Circuit affirmed the District Court's dismissal of the consumer fraud and 2003 fraud claims, but vacated dismissal of the remaining claims finding that James Sr.'s competency was a disputed factual issue. See Mandarino v. Mandarino, 180 F. App'x 258, 260-61 (2d Cir. 2006). Specifically, the court stated that "in the circumstances presented, the District Court should not have resolved the fact-specific equitable tolling issue on defendants' motion to dismiss." Id. at 261. The court suggested that it might be resolved on a summary judgment motion and further noted that "the District Court would act well within its discretion on remand if it required plaintiff to make" an "evidentiary showing" on the issue of incapacity "before proceeding further with the case." Id. After the case was remanded to the District Court, the parties consented to have this matter decided by the undersigned pursuant to

28 U.S.C. § 636(c).  Consent to Proceed Before United States Magistrate Judge, filed May 29, 2007 (Docket # 46).

Following discovery on the issue of equitable tolling, the parties filed pre-trial order materials.  See Joint Civil Pretrial Order, filed Mar. 30, 2007 (Docket # 34).  Because discovery was not in fact concluded at that point, the parties engaged in additional discovery and then submitted pre-trial materials to the Court on May 5, 2008.  See Letter from Kim E. Sparano, dated May 5, 2008 (Docket # 132) (attaching, inter alia, the Joint Pretrial Order) ("Joint Pretrial Order").[1]  Upon review of these materials, the Court instructed the defendants to move for summary judgment inasmuch as they contended that there were no factual issues to be tried.  Order, filed May 8, 2008 (Docket # 56), at 1.  Following the filing of the summary judgment papers,[2] however, it became apparent that there were indeed disputed issues of fact and thus the Court denied the summary judgment motion.  Order, filed Oct. 29, 2008 (Docket # 72) ("Oct. 29, 2008 Order").  The Court ordered that a hearing would take place on the issue of equitable

---

[1] These materials were docketed only recently because the parties had not previously filed them.

[2] Notice of Motion, filed May 30, 2008 (Docket # 59); Affirmation in Support, filed May 30, 2008 (Docket # 60); Memorandum of Law in Support of Defendants' James Mandarino and Alexandra Paolercio Motion for Summary Judgment, filed May 30, 2008 (Docket # 61); Local Civil Rule 56.1 Statement of Material Facts, filed May 30, 2008 (Docket # 62); Plaintiff's Civil Rule 56.1 Statement of Material Facts, filed June 26, 2008 (Docket # 63); Declaration of Michael S. Kimm in Opposition to defendants' Motion for summary judgment, filed June 26, 2008 (Docket # 64); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed June 26, 2008 (Docket # 65); Reply Affirmation, filed July 8, 2008 (Docket # 66); Response to Plaintiff['s] Local Civil Rule 56.1 Statements of Material Facts, filed July 8, 2008 (Docket # 67); Declaration of Frank Mandarino, filed July 29, 2008 (Docket # 70); Sur-Reply affirmation of Michael S. Kimm, Esq., in further opposition to defendants' motion for summary judgment, filed Aug. 1, 2008 (Docket # 71).

tolling or estoppel. Id. at 1.[3]  The Court also directed that this proceeding would be governed by the Pretrial Order previously submitted to the Court by the parties on May 5, 2008. Endorsed Letter, filed Jan. 27, 2009 (Docket # 91).

In the meantime, on May 8, 2008, James Sr. died. See Florida Certificate of Death (annexed as Ex. A to Declaration of Joseph DiGregorio, Esq., filed Apr. 20, 2009 (Docket # 110)). The Court substituted Patricia Mandarino, the personal representative of James Sr.'s estate, as the plaintiff in this matter. See Order, filed June 5, 2009 (Docket # 119).

On September 30 and October 1, 2009, the Court held a two-day evidentiary hearing on the issue of equitable tolling. Following the hearing, the parties filed memoranda of law. See Post-Trial Memorandum of Law of Plaintiff James J. Mandarino, filed Nov. 16, 2009 (Docket # 128) ("Pl. Mem."); Post Hearing Brief, filed Nov. 16, 2009 (Docket # 129); Post-Trial Opposition Memorandum of Law of Plaintiff James J. Mandarino, filed Nov. 30, 2009 (Docket # 130) ("Pl. Reply"); Post Hearing Reply Brief, filed Nov. 30, 2009 (Docket # 131).

B.     Evidence at the Hearing

Originally the scope of the hearing was to decide James Sr.'s competency from 1993 until 2002. (See Tr. 12).[4]  During the course of proceedings, however, defendants agreed to forgo arguing that James Sr. was competent during the period 1993 to 1994. (See Tr. 268-69). Accordingly, the Court has considered only the question of whether tolling is appropriate from

---

[3] In its Order, the Court noted that the issue of equitable tolling or estoppel was properly tried to the Court in an evidentiary hearing rather than before a jury at a trial. See Oct. 29, 2008 Order at 1.

[4] "Tr." refers to the transcripts of the evidentiary hearing. See Transcripts of Proceedings held on Sept. 30, 2009, filed Oct. 28, 2009 (Docket # 126); Transcripts of Proceedings held on Oct. 1, 2009, filed Oct. 28, 2009 (Docket # 125).

January 1, 1995 through December 31, 2002.

We summarize the relevant testimony and evidence submitted by each party during the course of the hearing. The Court does not review any of the evidence introduced by plaintiff on the topic of alleged acts by defendants of forgery and conversion of property belonging to James Sr. because, contrary to plaintiff's argument, see Pl. Mem. at 13, these allegations have little or no bearing on James Sr.'s own mental competence.

1. Plaintiff's Case

Marisa Kaufman, the daughter of James Sr. and Paolercio, testified that on November 14, 1993, her father was hospitalized following a drug overdose. (Kaufman: Tr. 15-16). He remained in a coma for several days and when he awoke he "was very emotional" and "his speech was garbled." Id. at 16. Some time after his release from the hospital, her father and mother divorced and James Sr. left to live with his father in the Bronx. See id. at 76. Kaufman would see her father "on an intermittent basis every few months until his death." Id. at 19. During that time, she observed that her father's "speech was impaired, his mental facilities were much, much slower, his physical self was awkward, and he had a shuffling about his feet." Id. at 19-20. She testified that "had I not known he was my father, I would have thought he was mentally impaired." Id. at 20. She also testified that following his hospitalization, she would not leave her father unsupervised with her children "because he wasn't trustworthy [or] responsible." Id. at 21. Nonetheless, she did state that she never sought to have a guardian appointed for him, or to have him hospitalized or committed; and that she was aware he worked at an automobile dealership. Id. at 89-90.

Douglas Jones, an attorney and acquaintance of defendant James Jr., testified that in 1997

5

he was approached by James Jr. to represent his father in a lawsuit in which James Sr. sought return of a car impounded following a minor traffic accident.  (See Jones: Tr. 164-69).  Jones stated that during the course of his representation he dealt primarily with James Jr.  See id. at 170-72.  He also had some brief telephone conversations with James Sr. in 1997, during which he "never had the impression that he wasn't with it or able to understand what I was saying."  Id. at 179-81.  Jones met James Sr. in person only in 2003 or 2004, at which time he "looked to be in extremely poor health" and his mental faculties were "not great."  Id. at 175.

The Court admitted into evidence two expert reports by Dr. Jerome Goodman who evaluated James Sr. in 2003 and 2006, which were adopted by Dr. Goodman as his testimony after he was qualified as an expert.  (See Goodman: Tr. 188, 196-98).  In both reports, Dr. Goodman opined that in 2003 and 2006 James Sr. had "Cognitive Disorder Secondary to Heroin Overdosage and Cerebral Anoxia" and that this diagnosis was "unchanged" at the time of each report. See Letter from Dr. Jerome D. Goodman to Mr. Michael S. Kimm, dated Sept. 11, 2003 (Pl. Ex. 2A) ("2003 Ex. Report"), at 3; see also Psychiatric Examination, dated Oct. 5, 2006 (Pl. Ex. 2B) ("2006 Ex. Report") (same), at 2.  Dr. Goodman concluded that it was "possible to state with medical certainty that Mr. Mandarino did not have sufficient competency and cognitive facility in 1993 or 1994 to understand legal matters and to conduct business affairs with sufficient understanding."  2003 Ex. Report at 3-4; see also 2006 Ex. Report at 3 (same).  Defendants elected not to cross-examine Dr. Goodman.  (See Goodman Tr. 202-03).[5]

---

[5] The plaintiff also offered deposition testimony of James Sr. and of Russell Leisner. (See Tr. 204-10).  In his depositions, James Sr. made some conclusory statement regarding his capacity.  See, e.g., James J. Mandarino Dep. at 28, Jan. 3, 2008 ("I was completely out of it."). But plaintiff has pointed to nothing in the depositions that provides specific evidence regarding James Sr.'s ability to function for the period from 1995 to 2002.

2.   Defendants' Case

James Sr.'s brother Gerard Mandarino testified that prior to his brother's hospitalization, he worked with him at Broadway Auto Sales, a business primarily dedicated to automobile wholesaling. (See G. Mandarino: Tr. 100). Sometime prior to 1993, James Sr. purchased a gas station in Elmwood Park, New Jersey and re-opened it as an Amoco gas station. See id. at 101. Gerard joined him and was employed in effect as the gas station's general manager. See id. After James Sr. was released from the hospital in 1993 and until 2002, Gerard would see him when James Sr. would visit the gas station. See id. at 105. Their exchanges were "relatively short" and "the longest might have been a half hour." Id. at 105. He testified that James Sr. was "kempt" and "presentable," and that he was "shaven." Id. at 109. Gerard added that "[t]here was nothing about his appearance that gave me any pause or question of anything being out of the ordinary." Id. Gerard added that "[h]e communicated very well with me." Id. The two talked about "general topics of conversation" as well as matters relating to the gas station, such as the number of gallons pumped. Id. at 110.

When asked about any change in James Sr. between the period before the hospitalization and afterwards, Gerard testified as follows:

> Before his hospitalization, my brother was very, very sharp with numbers
> and with anything having to do with the car business. That was his life's

---

Russell Leisner represented James Sr. on some legal matters, but met him on only three or four occasions and had no memory of him. See Russell Mark Leisner Dep. at 6-8, June 13, 2007. Accordingly, the Court does not view James Sr.'s participation in the litigation in which he was represented by Mr. Leisner to negate the possibility of equitable tolling. On the other hand, while plaintiff argues that James Sr.'s lack of participation in the lawsuit handled by Mr. Leisner is itself proof of incapacity, Pl. Mem. at 17-18, the Court finds this testimony of minimal weight inasmuch as there is no evidence that James Sr.'s lack of participation arose specifically because of any incapacity.

> work.  He had always been in the car business.  He was always very
> familiar with the numbers.  Numbers would change, values of cars would
> change, he was always up on it and he could calculate things in his mind
> very quickly, putting prices on cars, putting prices on five cars and which
> would be priced which, what would the total be, how would he then sell
> them, that type of knowledge.
>
> Afterwards he was not as sharp . . . .  Compared to other people I
> had met in the business, he was – there was no one better than him
> at that, no one quicker, no one better.  So that suffered a little.  But
> having said that, . . . his condition did not deteriorate to the point
> where he could no longer think about cars in that way and think
> about numbers, but he was a little slower.

Id. at 110-11.  He also noted that his speech "was a little bit more deliberate."  Id. at 112.

Gerald also testified that he did not view his brother as having suffered from any memory loss, id. at 134-35; that he did not shuffle or rock on his feet, see id. at 130; and that his condition remained generally the same through 2002, see id. at 111.

Another brother of James Sr., Joseph Mandarino, testified that following the overdose, James Sr. "helped [him] with the wholesale operation of Dan Buckey Ford" where Joseph was employed and where James Sr. had been employed many years earlier.  (See Tr. Joseph Mandarino: 140-41).  As a result, Joseph saw his brother regularly about three times a week between 1996 and 2001.  See id. at 140-41, 153-54.[6]  During that time period, James Sr. would "shop[] cars" for Joseph, id. at 141, meaning that he took cars from the Buckey dealership and tried to sell them to other car dealers, see id. at 142.  James Sr. would suggest a possible buyer for the car.  See id. at 151.  Joseph would propose an expected price for the car and, on occasion, James Sr. would express his disagreement with Joseph.  See id. at 152.  Once an amount was

---

[6] James. Sr. also testified at his deposition that he was selling cars during part of this period.  James J. Mandarino Dep. At 60-61, 90, May 31, 2007 ("James Sr. May 31, 2007 Dep.").

fixed, James Sr. would negotiate with the prospective buyer over the price of the cars, which were worth between $5,000 and $10,000.  See id. at 143, 152-53.  James Sr. sometimes got more than the price he and Joseph expected, and James Sr. kept any additional amount for himself. See id. at 152.

Joseph testified that James Sr. changed following his overdose in 1993.  Id. at 148-49. He testified that "[h]e wasn't as fluid" and that "[h]e hesitated more than" before and would "shuffle back and forth" on his feet when standing.  Id. at 149.  Nevertheless, Joseph entrusted his brother with cars to drive and sell on his behalf – an act he would not have done had he believed James Sr. to be incompetent.  See id.  In addition, any changes in his speech were not related to substance.  See id. at 150.  There were no topics that James Sr. was able to comprehend prior to the overdose that he was incapable of understanding after the overdose.  See id.  He was not less coherent afterwards.  See id. at 160.

Joseph also described a period in approximately 1996 during which he, Gerald, and James Sr. decided to put their father in a nursing home.  Id. at 145-47.  They were given tours of nursing homes.  See id. at 146.  The three of them talked about it, including what places to tour. See id. at 145-47.

James Jr., the son of James Sr., testified that his father's demeanor changed after his hospitalization in that his speech became more deliberate.  (See James Mandarino: Tr. 229). However, he testified that his father did not exhibit signs of uncontrolled rocking, memory loss, or other cognitive difficulties.  Id. at 229-30.  Between 1993 and 2001, he had regular interactions with his father, and in particular, assisted him in negotiating plea deals in New Jersey municipal court after James Sr. accumulated speeding tickets.  See id. at 231.  James Sr.

appeared to understand these negotiations. See id. at 231-32.

II.     DISCUSSION

We will assume – as have the parties – that federal law governing tolling applies to plaintiff's federal law claim, and that state tolling law applies to any state law claims. See, e.g., Scantek Med., Inc. v. Sabella, 583 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) ("In a diversity case, state law governs the limitations period for state law claims, and federal statutes of limitation govern the federal law claims." (citations omitted)); Prohaska v. Sofamor, S.N.C., 138 F. Supp. 2d 422, 433 (W.D.N.Y. 2001) ("When jurisdiction is based on diversity of citizenship, a federal court is obliged to apply a state statute of limitations.  In addition . . . state rules that are an integral part of the statute of limitations, such as tolling rules, apply to state claims brought in federal court." (quoting 17 Moore's Federal Practice § 124.03 (3d ed. 2008)); Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liber., 23 F. Supp. 2d 439, 448 (S.D.N.Y. 1998) (in a case removed to federal court, "state law governs the tolling of the statute of limitations for the state claims presented to the federal court." (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 (1938)).

    A.     Equitable Tolling of Plaintiff's Federal Claims

"As a general matter, a litigant seeking equitable tolling must establish two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Bolarinwa v. Williams, 593 F.3d 226, 231 (2d Cir. 2010) (quoting Lawrence v. Florida, 549 U.S. 327, 336 (2007)).  "Equitable tolling applies only in the rare and exceptional circumstance." Bertin v. United States, 478 F.3d 489, 494 n.3 (2d Cir. 2007) (quoting Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000) (per curium)).  The

10

Second Circuit has recognized that "mental illness can warrant equitable tolling of a statute of limitations," Bolarinwa, 593 F.3d at 232 (citation omitted), and has also noted that such claims are "highly case-specific," id. (citations omitted); accord Boos v. Runyon, 201 F.3d 178, 184 (2d Cir. 2000). The party seeking such tolling must provide "a particularized description of how her condition adversely affected her capacity to function generally or in relationship to the pursuit of her rights." Boos, 201 F.3d at 185. A court evaluating whether equitable tolling is appropriate on the grounds of mental impairment should "consider[] all of the circumstances of the case." Canales v. Sullivan, 936 F.2d 755, 759 (2d Cir. 1991); accord Brown v. Parkchester S. Condo., 287 F.3d 58, 60 (2d Cir. 2002). In the end, a plaintiff seeking equitable tolling must demonstrate that her particular disability "severely impair[ed] her ability to comply with the filing deadline, despite her diligent efforts to do so." Bolarinwa, 593 F.3d at 232; see, e.g., Canales, 936 F.2d at 759 (equitable tolling permissible where mental illness prevented plaintiff "from comprehending her right" to take legal action).

The Court credits in full the testimony of the two witnesses with no apparent interest in the outcome of this case: Gerard Mandarino and Joseph Mandarino, James Sr.'s brothers. Both of these witnesses testified frankly and without hesitation. Joseph in particular had continuous contact with James Sr. – approximately three times a week – during almost the entire period at issue, (see Joseph Mandarino: Tr. 140-54), which was far more contact than Kaufman had inasmuch as she saw her father only every few months, (see Kaufman: Tr. 19). Both Gerald and Joseph describe James Sr. as an individual who functioned in society. Joseph described James Sr. as doing complex tasks – in particular arriving at a value for used cars, driving to car dealers, and negotiating with those car dealers for the sale of the cars. (See Joseph Mandarino: Tr. 140-

54). Nothing in their testimony suggests that between 1995 and 2002 James Sr. suffered from a condition that affected his ability to "function generally," Boos, 201 F.3d at 185, or that "severely impair[ed]" his ability to protect his legal rights and interests, Bolarinwa, 593 F.3d at 232. Certainly, nothing reflects that he would have been unable to "comprehend[] [his] right" to file a lawsuit with respect to any legal matter. Canales, 936 F.2d at 759.

Plaintiff relies heavily on Dr. Goodman's expert reports to argue that James Sr. was incompetent from 1995 until 2002. See Pl. Mem. at 7-8; Pl. Reply at 3-6. These reports are of limited value, however, because Dr. Goodman's conclusions address with specificity only James Sr.'s abilities in 1993 and 1994. Specifically, each report ends with the sentence "[Ten/Thirteen] years after the [heroin overdose in November 1993], it makes it possible to state with medical certainty that Mr. Mandarino did not have sufficient competency and cognitive facility in 1993 or 1994 to understand legal matters and to conduct business affairs with sufficient understanding." 2003 Ex. Report at 3-4; see also 2006 Ex. Report at 3 (same). The Court accepts that the reports indicate that Dr. Goodman believes that there was some kind of impairment in James Sr.'s functioning in the 1995 to 2002 time frame. The first report, from 2003, states that "there are still residua of organic brain syndrome symptomatology." 2003 Ex. Report at 3. The second report, from 2006, states that "this man is still not totally recovered from the insult to the central nervous system that he suffered in 1993." 2006 Ex. Report at 2. In both reports, the diagnosis is "Cognitive Disorder secondary to Heroin Overdosage and Cerebral Anoxia," id.; see also 2003 Ex. Report at 3 (same), and Dr. Goodman states that this diagnosis is "unchanged" – apparently referring to the time period since the heroin overdose, see 2006 Ex. Report at 2. But Dr. Goodman does not claim to have had any contact with James. Sr. prior to

2003, and the report provides little help in determining precisely what Dr. Goodman believes was James Sr.'s level of functioning during this time period. The fact that James Sr. was experiencing "cognitive disorder" and "cerebral anoxia" simply does not provide insight into James Sr.'s level of functioning. In sum, while the Court finds the reports to have some value, they are far outweighed by the reports of James Sr.'s brothers, who actually saw him on a regular basis during the relevant time period.

The testimony of both Gerald and Joseph made clear that although James Sr. changed following his overdose and hospitalization, he remained functional from the perspective of understanding important matters. To repeat, Joseph Mandarino testified that during the relevant time period his brother continued to sell used cars and that in doing so would assess the proper value of the merchandise, negotiate pricing, and sometimes exceeded expectations in procuring a better sales price. (Joseph Mandarino: Tr. 148-53). Gerard Mandarino also stated that, although slower, his brother remained able to assess the value of cars for wholesale. (G. Mandarino: Tr. 110-11). Neither man observed that their brother suffered from significant memory loss or other symptoms that would lead them to conclude he was not mentally capable of functioning. (See G. Mandarino: Tr. 134-44; Joseph Mandarino: Tr. 149-55).

The specificity of Joseph Mandarino and Gerald Mandarino's testimony contrasts with the more general statements offered by Marisa Kaufman. Essentially, she testified that following her father's release from the hospital, he was not trustworthy, his "mental facilities were much, much slower" and his speech was "impaired," and "had [she] not known [that] he was [her] father, [she] would have thought he was mentally impaired." (Kaufman Tr: 19-21). But Kaufman never provided specific examples or any other explanation for her conclusions.

The testimony offered by Jones essentially did not speak to the competency of James Sr. but dwelled almost exclusively on the fact that Jones dealt, for the most part, with James Jr. when litigating on behalf of James Sr.  Finally, the deposition testimony of James Sr. was far too conclusory to be of any assistance in assessing his functioning.

In light of the compelling evidence that James Sr. was a functional adult during the relevant period, including the descriptions provided by his brothers of his functioning, the fact that he was able to sell cars, the evidence that he was involved in having his father placed in a nursing home, the fact that he had remarried, see James Sr. May 31, 2007 Dep. at 26, and the fact that he had an active American Express card and bank account in 1995, see Def. Ex. A; Def. Ex. B, plaintiff has not met the burden of providing "a particularized description of how [James Sr.'s] condition adversely affected his capacity to function generally or in relationship to the pursuit of [his] rights."  Boos, 201 F.3d at 185.

### B. Tolling of State Law Claims Under N.Y. C.P.L.R. § 208

New York Civil Procedure Rule § 208 permits tolling the limitations period on account of a party's "infancy or insanity at the time the cause of action accrues."  Although state law does not define "insanity" for tolling purposes, the New York Court of Appeals has held that the term must be "narrowly interpreted" and applies "to only those individuals who are unable to protect their legal rights because of an over-all inability to function in society."  McCarthy v. Volkswagen of Am., Inc., 55 N.Y.2d 543, 548 (1982); accord Hedgepeth v. Runyon, 1997 WL 759438, at *4 (S.D.N.Y. Dec. 10, 1997) ("The disability must be of such a nature that plaintiff is unable to manage his business affairs and is incapable of comprehending and protecting his legal rights and liabilities.") (internal citations omitted).  For the reasons just discussed, plaintiff has

not demonstrated that James Sr.'s condition satisfied the test set forth under New York law. The New York cases cited by plaintiff that found tolling due to insanity plainly do not support the application of the doctrine to James Sr. Indeed, merely stating the condition of the plaintiffs in these cases is sufficient to distinguish them from James Sr.'s situation. See, e.g., Ferreira v. Maimonides Med. Ctr., 43 A.D.3d 856, 857 (2d Dep't 2007) (plaintiff was "unresponsive," "in need of breathing and feeding support," and "did not move from his bed unless carried"); Carrasquillo v. Holliswood Hosp., 37 A.D.3d 509, 510 (2d Dep't 2007) (plaintiff suffered from "brain injuries, which . . . resulted in her requiring long-term care and the appointment of a guardian ad litem"); Schulman v. Jacobowitz, 19 A.D.3d 574, 576 (2d Dep't 2005) (plaintiff suffered stroke, was hospitalized and in nursing home, "opened his eyes to stimuli but could follow no commands," and could not communicate "his wants, needs, and feelings"); Costello v. N. Shore Univ. Hosp. Ctr. for Extended Care & Rehab., 273 A.D.2d 190, 190 (2d Dep't 2000) (plaintiff suffered "cerebral hemorrhage while hospitalized, which resulted in severe disability").[7]

---

[7] Plaintiff briefly argues that equitable tolling is appropriate also because defendants fraudulently concealed their actions. See Pl. Mem at 30-34. Putting aside the issue of whether plaintiff has marshaled evidence that affirmatively demonstrates the applicability of this doctrine, the issue is not part of this case. First, the Second Circuit indicated that the only matter that plaintiff was entitled to present on remand was "evidence demonstrating how he could have been mentally incapable of timely pursuing this action at the same time that he was able to pursue other lawsuits." Mandarino II, 180 F. App'x at 261. This limitation was eminently sensible inasmuch as plaintiff did not raise the issue of fraudulent concealment when he opposed the defendants' motion to dismiss the complaint on, inter alia, statute of limitations grounds. See Plaintiff's Memorandum of Law in Opposition to Defendants' Rule 12(b)(6) Motion to Dismiss and Rule 11 Motion for Sanctions, filed Apr. 1, 2004 (Docket # 7). Nor did he raise it on appeal of the judgment dismissing the action. See Appellant's Brief, Mandarino v. Mandarino, No. 05-4214 (2d Cir. Jan. 4, 2006). Thus, Judge Wood properly concluded when the case was first remanded that the mental incapacity claim was the only remaining issue to be tried. See, e.g., Memorandum Endorsement, filed Dec. 14, 2007 (Docket # 54).

Conclusion

For the foregoing reasons, plaintiff is not entitled to rely on the doctrine of equitable tolling to avoid the statute of limitations bar on his claims. Accordingly, defendants' motion to dismiss on statute of limitations grounds (Docket # 5) is granted. The Clerk is requested to enter judgment dismissing the case.

Dated: March 29, 2010
New York, New York

                                                                                       _____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Michael Kimm, Esq.
Kim Sparano
41 Bancker Street
Englewood, NJ 07631

Suzanne M. Halbardier
Barry, McTiernan & Moore
2 Rector Street, 14th Floor
New York, NY 10006

---

Moreover, plaintiff stated in the Joint Pretrial Order that the only issue to be decided was whether James Sr. lacked "sufficient cognitive facility from December 3, 1993 through 2002 to understand legal matters or conduct business affairs." Joint Pretrial Order at 2. In the same document, plaintiff stated that "because of James J. Mandarino's lack of competency, the doctrine of equitable tolling applies to this matter." Id. The only remaining issues in this case, according to plaintiff, were issues relating to the "merits of the case." Id. at 3. Thus even had the Second Circuit not limited the remaining issue in this case, any claim of fraudulent concealment was waived.

Conclusion

For the foregoing reasons, plaintiff is not entitled to rely on the doctrine of equitable tolling to avoid the statute of limitations bar on his claims. Accordingly, defendants' motion to dismiss on statute of limitations grounds (Docket # 5) is granted. The Clerk is requested to enter judgment dismissing the case.

Dated: March 29, 2010
       New York, New York

*[signature]*

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Michael Kimm, Esq.
Kim Sparano
41 Bancker Street
Englewood, NJ 07631

Suzanne M. Halbardier
Barry, McTiernan & Moore
2 Rector Street, 14th Floor
New York, NY 10006

---

Moreover, plaintiff stated in the Joint Pretrial Order that the only issue to be decided was whether James Sr. lacked "sufficient cognitive facility from December 3, 1993 through 2002 to understand legal matters or conduct business affairs." Joint Pretrial Order at 2. In the same document, plaintiff stated that "because of James J. Mandarino's lack of competency, the doctrine of equitable tolling applies to this matter." Id. The only remaining issues in this case, according to plaintiff, were issues relating to the "merits of the case." Id. at 3. Thus even had the Second Circuit not limited the remaining issue in this case, any claim of fraudulent concealment was waived.